In the

# United States Court of Appeals
## for the Seventh Circuit

———————————

No. 25-1121

WESLEY J. GIBSON,

*Plaintiff-Appellant*,

*v.*

CHUBB NATIONAL INSURANCE COMPANY,

*Defendant-Appellee*.

———————————

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 20-cv-1069 — **Elaine E. Bucklo**, *Judge*.

———————————

ARGUED OCTOBER 29, 2025 — DECIDED JULY 13, 2026

———————————

Before SYKES, ST. EVE, and MALDONADO, *Circuit Judges*.

SYKES, *Circuit Judge*. In October 2019 a freak lightning strike sparked a devastating fire at Pine Manor, Wesley Gibson's 24,000-square-foot countryside mansion in southern Illinois. The fire caused a constructive total loss of the mansion and its contents. Gibson promptly filed a claim with Chubb National Insurance Company, his insurer.

Gibson purchased Pine Manor almost 30 years ago as a private vacation home for his family. Over time he renovated it and filled its rooms with expensive furniture, antiques, and artwork from all over the world. He also transformed the property into a commercial lodging and events venue, purchasing and refurbishing neighboring homes, and adding amenities like a pool and conference center to form what the estate's website calls a "luxury country inn and resort." Gibson and his family periodically stayed at Pine Manor after the change in its use—typically for about 70 days each year, mostly over weekends and holidays. But the estate is primarily a rental facility, and Gibson reported it on his tax returns as a business property with 365 days of commercial use.

Although Pine Manor's use changed over time, Gibson continued to insure the mansion under a homeowner's policy rather than upgrade to commercial property insurance. That proved to be a costly decision. At the time of the fire, the Chubb policy provided $8.75 million in coverage for the mansion under the "Deluxe House" section and $3.5 million for its contents under the "Deluxe Contents" section. But the contents section excluded coverage for losses to property used to conduct the insured's business, except "as provided under Extra Coverages." And the "Extra Coverages" section capped coverage for losses to business property at $25,000.

Chubb paid the full $8.75 million policy limit for the loss of the mansion itself; unlike the contents coverage, the Deluxe House coverage did not contain a business-property exclusion. But the insurer denied Gibson's $3.5 million claim for the loss of the mansion's contents, explaining that because he operated the property as a commercial lodging and events venue, the business-property exclusion in the contents cover-

age applied. Chubb accordingly paid only the $25,000 policy sublimit for loss of property used to conduct the insured's business.

Gibson sued Chubb for breach of contract, seeking the full $3.5 million in contents coverage; he also asserted claims under state insurance and consumer-fraud statutes. On cross-motions for summary judgment, the district judge held that Chubb had properly classified most (but not all) of Pine Manor's contents as business property, so she granted partial summary judgment for the insurer. The parties settled the few issues that remained, and the judge entered final judgment. Gibson appealed, challenging the partial summary judgment against him.

We affirm. Gibson operated Pine Manor as an upscale lodging and events facility and used nearly all the mansion's contents to conduct that business. The contents coverage in the Chubb policy promised to pay no more than $25,000 for losses to property used to conduct the insured's business. Chubb paid that amount in full, so the judge properly entered judgment for the insurer.

## I. Background

Gibson owns and manages Gibson Consulting Group, a Chicago-based logistics consulting firm. In the late 1990s, he purchased Pine Manor, a 24,000-square-foot mansion on a private lake in the foothills of the Shawnee National Forest on the outskirts of Carbondale, Illinois. Intending to use the mansion as a vacation home for his family, Gibson refurbished it and filled it with personal belongings: family heirlooms, furniture and artwork from a different home he had recently sold, and an oriental rug that he had given his wife to celebrate their first wedding anniversary.

To supplement the furnishings he already owned, he curated a lavish collection of antiques, artifacts, and fine art, including an Italian rococo-style mirror and windows from the original Lloyd's of London building. Over time, Gibson spent millions of dollars renovating, furnishing, and decorating Pine Manor.

He also gradually expanded the Pine Manor estate, transforming it from a stand-alone family mansion into a sprawling commercial lodging and events complex. He built conference facilities that could accommodate large groups and purchased neighboring homes—some modest, others grandiose—to house additional guests. He also dotted the property with amenities, including a pool, carriage house, boat dock, and sports courts. The estate eventually grew to include almost a dozen structures occupying over 100 wooded acres.

With the Pine Manor compound's growing size came a shift in the mansion's use. Whereas Gibson and his family were once the mansion's only visitors, the estate soon began to welcome paying guests. Between 2016 and 2019, Gibson's consulting firm paid a $70,000 monthly retainer to use Pine Manor for its corporate training retreats; each year, the estate hosted up to 20 weeks of client training. And on weekends Pine Manor was a popular wedding venue: Starting in about 2010, at least six and sometimes as many as sixteen weddings were celebrated at Pine Manor every year.

Gibson also made the Pine Manor properties available for short-term vacation stays. To attract guests, Gibson hired a marketing firm to design social-media pages and a website for the estate. Describing Pine Manor as a "luxury country inn and resort," the website boasted of its proximity to Southern Illinois University and its ability to accommodate large gath-

erings like family reunions, retirement celebrations, and birthday parties. At the time of the fire, the website also highlighted Gibson's impressive collection of antiques, promising prospective guests a "backdrop of fine art and collections from around the world." All told, in both 2017 and 2018, Gibson earned $1 million in lodging revenue from hosting guests at Pine Manor, and his personal tax returns consistently reported 365 "fair rental days" for the estate.

Many of Pine Manor's visitors stayed in the original mansion, enjoying unfettered access to its movie room, pub room, game room, dining spaces, and commercial and country kitchens. Guests also had access to the collectibles and heirlooms that filled these rooms. In fact, even after Pine Manor opened its doors to paying guests, Gibson continued to display his family heirlooms and antiques throughout the mansion because, in his words, it was "way cheaper than a storage unit" and "fun for people to see and use" them.

Indeed, only a few spaces were off-limits to guests: a wine cellar, a gun safe, and two locked closets in the master bedroom. In these closets Gibson and his wife stored clothing, jewelry, and other personal items they used when visiting Pine Manor; the family didn't relinquish *all* personal use of the mansion after it opened to the public for corporate, group, or individual stays. Rather, they continued to spend approximately 70 nights a year at Pine Manor, primarily over holidays and weekends. And in 2019 Gibson spent seven weeks at the mansion while recuperating from an illness.

Given the size of the estate and the range of events it hosted, Gibson obtained a bed and breakfast license from the City of Carbondale, liquor licenses from both the city and the state, and authorization from the state to use Pine Manor for

commercial purposes. He also hired an on-site property manager whose responsibilities include maintaining the estate, responding to guest inquiries, and coordinating with outside vendors. The estate also employs approximately ten other full-time employees who handle the housekeeping and landscaping duties.

In June 2017 an underwriter at Chubb, Pine Manor's insurer, discovered that Gibson was no longer using the property solely for personal use. She accordingly warned Gibson's insurance broker about the possibility of a "large gap in coverage" based on exclusions in Gibson's homeowner's insurance policy. She recommended that Gibson switch to a commercial property-insurance policy. That didn't happen. Gibson instead renewed his "Masterpiece" personal homeowner's policy in both 2018 and 2019.

On October 22, 2019, lightning struck the Pine Manor mansion and ignited a fire that swept through the house. The mansion was unoccupied at the time, so no one was hurt. But the entire house, as well as everything in it, was deemed a total loss.

Gibson promptly filed a claim with Chubb under his Masterpiece homeowner's policy, which provided about $8.75 million in "Deluxe House" coverage and $3.5 million in "Deluxe Contents" coverage. The former covered the mansion itself, whereas the latter covered the personal property inside it. After inspecting what was left of the mansion and reviewing Pine Manor's website, Chubb determined that Gibson was entitled to the full $8.75 million coverage limit for the loss of the mansion. But for the loss of everything else, Chubb agreed to pay only $25,000.

The insurer's explanation centered on a sublimit in the Deluxe Contents portion of the policy for losses to "business property." The Deluxe Contents coverage generally protected against "all risk of physical loss" to the mansion's "contents"—that is, Gibson's and his family's "personal property." That broad grant of coverage, however, carried an exclusion for losses to "business property." Under the heading "Exclusions," the contents section of the Chubb policy states: "**Business property.** We do not cover any loss to business property other than as provided under Extra Coverages." And the cross-referenced "Extra Coverages" section provided only very limited protection for losses to business property: Chubb promised to pay "up to $25,000 … for a covered loss to business property."

The Deluxe Contents section of the policy defines the term "business property" as follows:

> "Business property" means:
> - furniture, supplies, equipment, inventory;
> - books, records; and
> - electronic data processing property,
>   used to conduct your business.

But drones and like devices are excluded: "'Business property' does not include any drones or similar unmanned device, whether used in whole or in part in a business." (This provision may seem random now, but its role in Gibson's argument will become clear later.) Finally, and importantly here, the term "business" is defined very broadly as "any employment, trade, occupation, profession, or farm operation including the raising or care of animals or any activity intended to realize a benefit or financial gain engaged in on a full-time, part-time[,] or occasional basis."

Putting these pieces of the policy together, Chubb explained that because Gibson had been operating Pine Manor as a "luxury bed and breakfast and event venue"—that is, a business—its contents were subject to the business-property exclusion and his recovery was limited to the $25,000 sublimit in the "Business Property" provision in the "Extra Coverages" section. Chubb also reminded Gibson that its underwriter had previously flagged "significant gaps in liability" and that Gibson had nonetheless "elected to maintain and renew" his Masterpiece homeowner's policy.

Gibson sued Chubb alleging claims for (1) breach of contract; (2) "vexatious and unreasonable" conduct in violation of § 155 of the Illinois Insurance Code, 215 ILL. COMP. STAT. 5/155; and (3) "unfair or deceptive acts or practices" in violation of § 2 of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILL. COMP. STAT. 505/2.

After extensive discovery, both parties moved for summary judgment. Synthesizing the relevant provisions of the Masterpiece policy, the district judge concluded that the $25,000 sublimit applied to any "property that is used, whether partially or fully, to conduct the insured's 'business.'" And it was clear, she explained, that Gibson operated Pine Manor as a business: "In addition to weddings and other events, Pine Manor hosted multiple weeks of client trainings and seminars for Gibson Consulting each year, and Gibson Consulting paid a monthly retainer for that privilege." Because Pine Manor's contents were "overwhelmingly used" to further this luxury lodging and events business, they qualified as "business property" and thus were subject to the policy's $25,000 coverage limit.

The judge also concluded, however, that certain items of property did not qualify as business property. As we've noted, some areas of Pine Manor were not accessible to guests—namely, two locked closets in the master bedroom, a wine cellar, and a gun safe. Because guests could neither use nor access these areas of the mansion, the judge held that the property stored in these spaces was not used to further Gibson's luxury rental business. The judge thus carved out this narrow portion of Gibson's claim and allowed it to proceed.[1] Otherwise, she entered partial summary judgment for Chubb on the contract claim.

The fate of the two statutory claims was tied to the contract claim. The judge concluded that because Chubb had properly interpreted and applied the insurance contract, its conduct was neither "vexatious" nor "unreasonable" under § 155 of the Illinois Insurance Code. For much the same reason, the judge rejected Gibson's claim that Chubb had violated § 2 of the Illinois Consumer Fraud Act. Accordingly, the judge entered summary judgment for Chubb on the statutory claims too.

After two years of additional litigation, the parties settled the few remaining issues, and the judge entered final judgment. Gibson appealed, challenging the judge's summary-judgment ruling.

## II. Discussion

Because this suit invokes the court's diversity jurisdiction, the law of the forum state—here, Illinois—governs these

---

[1] The judge also denied summary judgment on a separate claim under the Masterpiece policy's "Valuable Articles" provision, but that claim has no relevance here.

state-law claims. Under Illinois law a court's "primary objective" in construing an insurance policy is to give effect to the parties' intent "as expressed in the policy language." *Acuity v. M/I Homes of Chi., LLC*, 234 N.E.3d 97, 105 (Ill. 2023). To that end, the court gives the terms of the policy, unless otherwise defined, "their plain, ordinary, and popular meaning." *Id.* (quotation omitted); *see Mkt. St. Bancshares, Inc. v. Fed. Ins. Co.*, 962 F.3d 947, 952 (7th Cir. 2020) (interpreting Illinois law accordingly). We review the summary-judgment order—including the embedded contract-interpretation questions—de novo. *BB Syndication Servs., Inc. v. First Am. Title Ins. Co.*, 780 F.3d 825, 829 (7th Cir. 2015).

## A.  Contract Claim

The district judge's analysis of the contract claim was exactly right—both her interpretation of the insurance policy and the application of it to the facts of this case. Gibson's Masterpiece homeowner's policy caps Chubb's coverage obligation at $25,000 for losses to "business property," defined as all "furniture, supplies, equipment, inventory[,] books, records[,] and electronic data processing property," if these items are "used to conduct [the insured's] business."[2] And the

---

[2] For the first time at oral argument, Gibson's counsel suggested that the term "business property" might mean something different in the "Exclusions" section of the policy than it does in the "Extra Coverages" section. That argument is nowhere to be found in Gibson's briefs, so it is waived. *Quality Oil, Inc. v. Kelley Partners, Inc.*, 657 F.3d 609, 614–15 (7th Cir. 2011). Waiver aside, the argument is meritless: The business-property exclusion forecloses coverage for "any loss to business property other than as provided under Extra Coverages." This express reference to the "Extra Coverages" section of the policy incorporates the definition of "business property" found there, so "business property" carries the same meaning throughout the policy.

policy's definition of "business" is capacious: "any employment, trade, occupation, profession, or farm operation including the raising or care of animals or any activity intended to realize a benefit or financial gain engaged in on a full-time, part-time[,] or occasional basis."

Combining and simplifying these unwieldy definitions, the judge concluded that the term "business property" refers to any "property that is used, whether partially or fully, to conduct the insured's 'business.'" We agree.

Gibson contests this interpretation, arguing that the policy's definition of "business property" refers only to (as he puts it) "traditional business assets that are used exclusively in the operation of a business." His logic proceeds this way: The definition of "business property" lists several categories of property—e.g., equipment, inventory, books, records, and electronic data-processing property—that are conventionally associated with a commercial enterprise. And the other listed categories that are not *necessarily* associated with a commercial enterprise—e.g., supplies and furniture—must be construed in harmony with the rest of the distinctly commercial list. *See Yates v. United States*, 574 U.S. 528, 543 (2015) ("[T]he principle of *noscitur a sociis*" instructs that "a word is known by the company it keeps … ."). It thus follows, Gibson argues, that "business property" refers only to quintessential office furniture like desks and printer stands, not rococo-style mirrors and oriental rugs.

This argument ignores a defined term embedded within this definition. As we've noted, the term "business" is defined very broadly and extends well beyond commercial enterprises that operate in traditional office settings. By its terms, the definition encompasses farming—obviously not an office-

based activity—and contains a sweeping catchall clause encompassing "any activity" aimed at financial gain, whether engaged in on a full-time, part-time, or only occasional basis. Nothing in this definition limits the term to commercial enterprises that operate from traditional offices. It follows that the term "business property" is not limited to items found in traditional commercial office settings.

Gibson invokes the *noscitur a sociis* principle, which holds that associated words in a list "should be assigned a permissible meaning that makes them similar." ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 195 (2012). But this interpretive canon has force only when the grouped items are cohesive; in other words, when they have a "core of meaning" or at least share a "common feature." *Graham Cnty. Soil & Water Conservation Dist. v. U.S. ex rel. Wilson*, 559 U.S. 280, 288–89 & n.7 (2010); SCALIA & GARNER, *supra* at 196. Indeed, it is this shared connotation that contextually informs the meaning of ambiguous terms in the grouping and ensures that their meaning is consistent with that of "the company [they] keep[]."' *Gustafson v. Alloyd Co.*, 513 U.S. 561, 575 (1995).

Here, however, the categories of property listed in the definition of "business property" are generic terms (e.g., supplies, equipment, furniture) that lack a common quality. What makes them cohesive, providing the context for their interpretation, is the qualifier "used to conduct your business." And the definition of "business," as we've noted, is not limited to enterprises operated from traditional commercial offices. On the contrary, it includes farming and "any activity" aimed at achieving financial gain.

That brings us to Gibson's next argument, which centers on that phrase "used to conduct your business." As a reminder, the policy's definition of "business property" consists of a list of several categories of property followed by the modifier "used to conduct your business." Here it is again in full:

> "Business property" means:
> - furniture, supplies, equipment, inventory;
> - books, records; and
> - electronic data processing property,
>   used to conduct your business.

Gibson argues that the phrase "used to conduct your business" modifies only the third item in the bullet-point list: "electronic data processing property." There are two reasons, he says, to read the definition this way. The first is the placement of "used to conduct your business." Because this clause appears at the end of the definition rather than at the start, Gibson maintains that it modifies only the final term in the list. His second reason focuses on the use of a comma after the phrase "electronic data processing property." The other categories of property, Gibson notes, are separated by semicolons, so the phrase "used to conduct your business" shouldn't be read to modify them.

This argument doesn't make sense as a structural matter; nor does it favor the insured. If the qualifier—"used to conduct your business"—modifies only the last category in the list (data processing equipment), then everything listed before it (furniture, supplies, equipment, and so on) is subject to the $25,000 coverage cap *regardless* of how the insured uses it—that is, *whether or not* the insured used it for a business purpose. We doubt that any insured prefers that interpretation.

In any event, Gibson is wrong. The presence of the comma after "electronic data processing property" confirms that "used to conduct your business" modifies each of the preceding clauses. *Stepnowski v. Comm'r*, 456 F.3d 320, 324 (3d Cir. 2006) ("[W]here there is a comma before a modifying phrase, that phrase modifies all of the items in a series and not just the immediately preceding item."); *see* SCALIA & GARNER, *supra* at 161–62. The placement of the phrase "used to conduct your business" reinforces this interpretation: Because this clause is listed on its own line and lacks an introductory bullet point, it modifies each of the items that precede it. SCALIA & GARNER, *supra* at 156 ("[M]aterial contained in unindented text relates to all the … preceding indented subparts."); *cf. Martin v. United States*, 605 U.S. 395, 406–07 (2025).

Gibson also points to the adjacent drone provision, which provides that the term "business property" does not include drones and similar devices "whether used in whole or in part in a business." Because the general definition of "business property" lacks a similar qualifier, Gibson argues that it must refer only to property that is *wholly* used to conduct the insured's business; property that is used partially for personal purposes doesn't qualify.

If there's an inference to be drawn from the policy's drone provision, it's the opposite of the one Gibson asks us to draw. The "in whole or in part" language in the drone carve-out is necessary only if the general definition of "business property" broadly covers property that is used *either* wholly *or* partially for business purposes. If the general definition covers only property that is used *wholly* for business purposes—as Gibson argues—then the "in whole or in part" language would be unnecessary. Accordingly, Gibson's position that the $25,000

sublimit applies *only* to property used *entirely* for business purposes finds no support in the policy language.[3]

Finally, Gibson invokes two general principles that govern the interpretation of insurance policies: (1) the court must construe an insurance policy "as a whole, giving effect to every provision, if possible," *Zurich Am. Ins. Co. v. Infrastructure Eng'g, Inc.*, 248 N.E.3d 1072, 1081 (Ill. 2024) (quotation omitted); and (2) insurance provisions that "limit or exclude coverage" must be "interpreted liberally in favor of the insured and against the insurer," *Am. States Ins. Co. v. Koloms*, 687 N.E.2d 72, 75 (Ill. 1997). These general principles do not help Gibson's case. It is his interpretation—not Chubb's—that fails to give effect to the policy as a whole. Gibson's reading excises "farming" from the definition of "business" and fails to give full effect to the phrase "used to conduct your business" in the definition of "business property."

And the liberal-construction rule has no application here: That rule comes into play only when an insurance policy is ambiguous. *Rich v. Principal Life Ins. Co.*, 875 N.E.2d 1082, 1090 (Ill. 2007). This policy is not, and we "will not strain to find an ambiguity where none exists." *Id.* Gibson does exactly that. Insisting that the policy is ambiguous, he highlights the breadth of the general coverage grant in the Deluxe Contents section of the policy, which protects his (and his family's) personal property "against all risk of physical loss … anywhere in the world." That broad promise, he says, is impossible to

---

[3] Chubb does not argue, and we do not suggest, that *any* business use (even *de minimis* use) always transforms personal property into business property. This case doesn't require us to grapple with the margins or draw lines; Pine Manor's contents were used *overwhelmingly* for business purposes.

reconcile with an interpretation of "business property" that sweeps in anything used only partially for business purposes. He also points to his $48,000 annual premium—a ridiculous sum, he asserts, if it turns out that the policy covers next to none of Pine Manor's contents.

The short response is that broad coverage grants in insurance policies usually come with specific exclusions and limitations. And the business-property exclusion in this policy is clear, as is the business-property sublimit in the Extra Coverages section. Together, they cap Chubb's liability for losses to business property at $25,000. Gibson's annual premium, though costly, can't overcome these unambiguous provisions. *Galarza v. Direct Auto Ins. Co.*, 234 N.E.3d 75, 82 (Ill. 2023) ("If the insurance policy terms are clear and unambiguous, they must be enforced as written, unless doing so would violate public policy." (quotation omitted)).

That brings us to the application of the business-property sublimit to the facts of this case. The judge concluded that Gibson operated Pine Manor as a luxury lodging and events business and that its furnishings were "overwhelmingly used" to further that business. Gibson argues that the judge focused too heavily on his use of Pine Manor rather than its contents. Not exactly. To be sure, the judge began her analysis by examining whether Gibson operated Pine Manor as a business. But necessarily so: To determine how Gibson used Pine Manor's contents—and more specifically, whether he used them for business purposes—the judge first had to decide how Gibson used Pine Manor. Because Gibson's use of Pine Manor was inextricably bound up with his use of the property inside it, the judge appropriately considered the former to inform the latter.

Besides, after concluding that Gibson operated Pine Manor as a luxury lodging and events business, the judge went on to examine whether Gibson used Pine Manor's contents to further his business. He did—and overwhelmingly so. After all, décor and furnishings are the "furniture," "supplies," and "equipment" of any lodging or rental business. Pine Manor was no exception: Its website promised guests a "backdrop of fine art and artifacts from around the world." And Gibson acknowledged that he kept his family heirlooms at Pine Manor because it was "fun for people to see and use" them.

And they did: Guests had unfettered access to all but a few spaces in the mansion, and they freely used its furnishings and enjoyed its art and artifacts. In short, Pine Manor's furnishings, artwork, and decorations both enticed prospective guests to visit the property and contributed to their experience once there, so the judge correctly held that Gibson used the contents of the mansion to conduct his business.

The judge carved out the few personal areas that Gibson kept under lock and key—the wine cellar, gun safe, and locked closets in the master bedroom—holding that the contents of these spaces did not qualify as business property. She was right to draw that line: Because these items were not accessible to guests, they could not have contributed to the guest experience and thus were not used to conduct Gibson's business.

Gibson urges us to draw a different line—one that excludes all the furniture and decorations he purchased himself from the definition of "business property." As he notes, he purchased many of Pine Manor's furnishings long before the estate started to host paying guests. And even then, he and his

family continued to spend long weekends and holidays at Pine Manor, staying approximately 70 nights each year.

But the policy's definition of "business property" turns on how Pine Manor's contents were used; it doesn't matter whose bank account financed their purchase. And while it's true that Gibson and his family were once the only people who enjoyed Pine Manor's furnishings, by 2019 (when the governing policy was in effect and the loss occurred) those furnishings were overwhelmingly used for business purposes. That resolves this case.

Finally, Gibson accuses the judge of assuming the role of factfinder and accepting Chubb's version of the facts over his. But Gibson hasn't identified any evidence that he thinks the judge overlooked, misconstrued, or otherwise mishandled. He instead "points to a proverbial haystack and asks us to find his needle." *Boss v. Castro*, 816 F.3d 910, 914 (7th Cir. 2016). We decline to do so.

## B.  Statutory Claims

The statutory claims are nonstarters, so we can be brief. Section 155 of the Illinois Insurance Code entitles an insured to up to $60,000 in damages and reasonable attorney fees if an insurer takes "vexatious and unreasonable" action in resolving an insurance claim. 215 ILL. COMP. STAT. 5/155; *see Cramer v. Ins. Exch. Agency*, 675 N.E.2d 897, 900 (Ill. 1996) (describing § 155 as "an extracontractual remedy to policy-holders whose insurer's refusal to recognize liability and pay a claim under a policy is vexatious and unreasonable"). Gibson claims that Chubb violated § 155 twice over: first by formulating a deceptive scheme to evade coverage and second by conducting a "sham" investigation into his contents claim.

Gibson's first contention is borderline frivolous. "If there is a bona fide dispute regarding coverage—meaning a dispute that is '[r]eal, genuine, and not feigned'—statutory sanctions [under § 155] are inappropriate." *Med. Protective Co. v. Kim*, 507 F.3d 1076, 1087 (7th Cir. 2007) (first alteration in original) (quoting *McGee v. State Farm Fire & Cas. Co.*, 734 N.E.2d 144, 153 (Ill. App. Ct. 2000)). Here, Chubb's coverage dispute was not just "genuine"; it was justified. And "[i]t is neither vexatious nor unreasonable … to deny coverage based on a position that prevails." *PQ Corp. v. Lexington Ins. Co.*, 860 F.3d 1026, 1038 (7th Cir. 2017). Just so here.

Moving to Gibson's second contention, it too is meritless. Chubb conducted a reasonable investigation into Gibson's claimed loss. A claims representative and insurance adjuster visited Pine Manor shortly after the fire, and the insurer later examined Pine Manor's online presence. Gibson argues that Chubb should have investigated each item that was destroyed. But as best we can tell, a more detailed item-by-item investigation likely would have been an exercise in futility. Indeed, Gibson hasn't identified a single item that Chubb improperly classified as "business property" (as that term is properly understood).[4] So his complaint about the thoroughness of Chubb's investigation rings hollow.

Gibson's consumer-fraud claim fails for similar reasons. Section 2 of the Illinois Consumer Fraud and Deceptive Business Practices Act prohibits "deception[,] fraud, false pretense, false promise, [or] misrepresentation," among other

---

[4] Gibson does not argue, so we do not consider, whether any of Pine Manor's contents do not qualify as "business property" because they fall outside the discrete categories of property (furniture, supplies, etc.) that comprise the definition of that term.

things, "in the conduct of any trade or commerce." 815 ILL. COMP. STAT. 505/2. Gibson contends that Chubb sold him a policy that covered Pine Manor's contents and then fraudulently misclassified those contents as "business property" to avoid liability.

That's plainly not the case. Chubb interpreted the Masterpiece policy as written and justifiably concluded that Gibson was entitled to no more than the $25,000 sublimit for the loss of Pine Manor's furnishings. Because that coverage determination follows from the policy's plain terms, it was not deceptive.[5]

In sum, the judge properly entered summary judgment for Chubb on Gibson's claims for breach of contract and for violation of the Illinois Insurance Code and Consumer Fraud Act. The judgment is accordingly

AFFIRMED.

---

[5] For this reason, we need not consider Chubb's alternative argument that § 155 of the Illinois Insurance Code preempts Gibson's claim under § 2 of the Illinois Consumer Fraud Act. *See, e.g., Cook ex rel. Cook v. AAA Life Ins. Co.*, 13 N.E.3d 20, 32 (Ill. App. Ct. 2014); *Young v. Allstate Ins. Co.*, 812 N.E.2d 741, 757 (Ill. App. Ct. 2004).